UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN MILLER, JR., aka "Scrap" | No. 17 CR 319-4<br><br>Hon. John Robert Blakey |

**GOVERNMENT'S CONSOLIDATED RESPONSE**
**TO DEFENDANT MILLER'S POST-TRIAL MOTIONS**

On June 20, 2024, after a week of evidence—including testimony from two cooperating defendants, several law enforcement officers, a drug trafficking expert, and two chemists—a jury returned guilty verdicts against defendant (represented by attorney Beau Brindley) and co-defendant Eugene Alexander (represented by attorneys Gal Pissetzky and Jennifer Snyder) in this 2017 case that was led and investigated by a DEA and FBI joint task force. Specifically, the jury convicted defendant of possessing with the intent to distribute at least 400 grams of fentanyl, and it convicted Alexander of possessing with the intent to distribute at least 500 grams of cocaine.

Defendant now seeks a new trial under Rule 33 on the purported grounds that his attorney (Brindley) was under federal investigation at the time of trial, which—he contends—presented a conflict of interest. Contrary to defendant's contention, Brindley was not under investigation in June 2024. Rather, a different U.S. Attorney's Office (N.D. Ind.), and different federal agencies than the ones that investigated defendant Miller, had investigated Brindley for a brief period of time in

2020 and 2021. But that investigation was long closed by the time of defendant Miller's trial, it involved wholly distinct circumstances with no connection at all to Miller, and—as the events of Miller's case plainly reveal—it had no effect on Brindley's trial performance in the instant case.

The Court should deny defendant's motion without a hearing.

## I. INTRODUCTION

On September 14, 2017, defendant, Alexander, Ricardo Castaneda, and Santos Godina were charged by indictment with various narcotics offenses, stemming from an investigation conducted by the Drug Enforcement Administration. *See* R. 102. Castaneda and Godina pled guilty, pursuant to cooperation agreements, and testified against defendant and Alexander at trial. R. 251, 329.

With respect to defendant, the government proved that on or about April 13, 2016, defendant knowingly took possession of approximately five kilograms of fentanyl from Castaneda and Godina at a gas station near the Aurora Outlet Mall in suburban Chicago. R. 1 ¶¶ 17-42.[1] As the cooperating defendants testified, the drugs were provided to Miller on consignment (meaning, he would eventually have to pay back Castaneda and Godina after he sold them). Shortly after Miller took possession of the drugs (which occurred while several law enforcement officers were in the area conducting surveillance), he drove away from the gas station and discovered that he was being followed by law enforcement. Miller then attempted to lose to his tail

[1] Citations to the record are denoted with the prefix, "R." Citations to defendant's Rule 33 Motion for a New Trial are denoted with the prefix "Mot." Citations to the trial transcript are denoted with the prefix, "Tr." followed by page number. Citations to the trial exhibits are denoted with the prefix, "GX" followed by exhibit number.

before ultimately ditching his car with the drugs inside, which was later recovered by law enforcement.

As to Alexander, who proceeded to trial alongside defendant, the trial evidence proved that on April 11, 2016, the cooperators delivered approximately three kilograms of cocaine to Alexander in Melrose Park while law enforcement officers were in the area conducting surveillance. After taking possession of the cocaine, Alexander drove and was stopped by law enforcement after a short high-speed pursuit. During the stop, law enforcement seized the drugs that Godina provided to Alexander just a short time before the stop.

Trial originally was scheduled for April 15, 2019. R. 181. However, after several years of delay, caused in part by the COVID pandemic, trial ultimately commenced on June 11, 2024. R. 398. On June 20, 2024, the jury returned a guilty verdict against each defendant, finding Miller guilty of possessing with the intent to distribute 400 grams or more of fentanyl, and Alexander guilty of possessing with the intent to distribute 500 grams or more of cocaine—each charge carrying a statutory mandatory minimum term of imprisonment (10 years for Miller and five years for Alexander.). R. 408. Prior to trial, as set out more fully below, Brindley negotiated a highly favorable plea agreement, whereby the government agreed to drop the mandatory minimum charge against defendant; nevertheless, Miller chose to forego the deal and proceed to trial. Meanwhile, Pissetzky did not to secure a similar deal for Alexander, whose only hope to avoid the mandatory minimum was to prevail before the jury.

On August 9, 2024, defendant filed a *pro se* motion for release pending sentencing. R. 424. In his motion, defendant argued that his attorney, Beau Brindley, was under federal investigation at the time that Brindley represented Miller, which was unknown to Miller until after the trial. *Id.* About a week later, on August 16, 2024, defendant filed a *pro se* motion for acquittal or new trial on the same basis. R. 426. On August 20, 2024, Brindley withdrew as defendant's attorney, and new counsel for defendant filed an appearance. R. 429, 430. On the same day, the Court struck defendant's *pro se* motions because they were filed while defendant was represented by counsel and set new dates for post-trial motions. R. 431.

On December 2, 2024, after the appointment of new counsel, defendant filed a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29 and a motion for a new trial pursuant to Rule 33. R. 455, 456. Both lack merit, and—as explained below—defendant's Rule 33 motion rests on deeply flawed interpretations of two unrelated cases against an individual named Terry Ferguson, whose prosecutions bear no connection whatsoever to this one, and neither of which created a conflict for Brindley here.

## II. RELEVANT BACKGROUND

Defendant's Rule 33 motion rests on a federal investigation into Brindley that was revealed to him during an October 2023 sentencing hearing of defendant Terry Ferguson. In fact, Brindley represented Ferguson in two separate cases charged in 2018—*United States v. Ferguson*, 18 CR 734 ("*Ferguson I*") and *United States v. Ferguson*, 18 CR 858 ("*Ferguson II*")—both of which defendant badly misunderstands. Mot. at 3. As explained in more detail below, in *Ferguson I*, a potential conflict arose

when Brindley filed a 28 U.S.C. § 2255 petition against himself, prompting the government to request a conflicts colloquy to explore a waiver. And in *Ferguson II*, Brindley (for a time) was a potential fact witness against the other defendants charged with obstruction of justice in the same case, which prompted the government to seek his (temporary) removal on conflict-of-interests grounds until those defendants pled guilty. Ferguson's cases—and the investigation into Brindley conducted by ATF and the Northern District of Indiana (about which Brindley learned during the *Ferguson II* sentencing hearing)—have no connection, bear no resemblance, and had no impact on this case.

***Ferguson I***

In *Ferguson I*, defendant Terry Ferguson was charged with, and ultimately pled guilty to, conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846; and unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). *Ferguson I*, Dkt. 424. Ferguson was represented by Brindley throughout *Ferguson I.* When Ferguson was arrested on October 30, 2018, he was interviewed by ATF Special Agent Christopher Labno, who asked Ferguson whether he was interested in cooperating with law enforcement against Beau Brindley. *Id.*, Dkt. 161 (Ferguson Motion to Suppress), Ex. A at 3. Ferguson initially expressed interest in cooperating against Brindley, but he ultimately decided against doing so. *Id.*, Dkt. 507 (Ferguson Sentencing Hearing) at 276, 280.

During Ferguson's sentencing hearing on October 20, 2023, Brindley called Agent Labno as a witness. During direct examination, Brindley asked Agent Labno

about his October 30, 2018, interview of Ferguson and, specifically, about whether Agent Labno had obtained authorization from the Department of Justice to investigate Brindley; Agent Labno responded that agents did obtain the requisite authorization from Main Justice, but he could not remember when that authorization officially occurred. *Id.* at 272, 276. In fact, Brindley had been formally investigated by the U.S. Attorney's Office for the Northern District of Indiana between June 2020 and December 2021. Ex. A (Jan. 7, 2025, NDIN Letter). No charges were filed. *Id.*

After Ferguson's sentencing hearing, on January 17, 2024, Brindley filed a motion to vacate based, in part, on a potential conflict of interest between Brindley and his client, Ferguson, that arose when he learned on October 20, 2023, that ATF agents had formally investigated him in the course of Ferguson's case. *Id.*, Dkt. 492. The government filed a response in opposition to the motion on February 1, 2024, arguing, as relevant here, that there was no conflict of interest or ineffective assistance of counsel that would warrant relief. *Id.*, Dkt. 497. In an opinion issued on February 12, 2024, the Court (Kennelly, J.) ruled that it no longer had jurisdiction over defendant's case, in light of Ferguson's pending appeal, and invited defendant to advise whether he wished to convert his motion to a petition pursuant to 28 U.S.C. § 2255. *Id.*, Dkt. 500.

On March 7, 2024, defendant converted his motion to a § 2255 petition. *Id.*, Dkt. 506. In his supplemental filing, Brindley continued to argue that a conflict existed, and that Ferguson's conviction should be vacated and that he should be resentenced. *Id.* In response, the government persisted that no actual conflict

existed, and that Ferguson failed to identify any "incompatible interests" between himself and his attorney, Brindley. *Id.*, Dkt. 517 at 9. The government further argued that, even if there had been a conflict of interest between Brindley and Ferguson, Ferguson failed to establish that it adversely affected Brindley's performance in the case or at sentencing. *Id.* at 10-15. The Court has not yet ruled on Ferguson's § 2255 petition.

***Ferguson II***

In *Ferguson II*, Terry Ferguson, along with co-defendants John Deir and Timothy Ferguson (Terry Ferguson's son), were charged by complaint with conspiring to knowingly and intentionally distribute 500 grams or more of cocaine. *Ferguson II*, Dkt. 1. Ferguson was arrested on October 30, 2018, pursuant to the arrest warrant issued in *Ferguson I*, discussed above. *Id.*, Dkt. 74 (Motion to Disqualify) at 2. After Terry Ferguson was arrested, however, the investigation into his co-defendants continued, and a grand jury subpoena was served on Individual A—a former business partner of Terry Ferguson—seeking testimony and records. *Id.* at 2-3.

On November 7, 2018, while Terry Ferguson was in federal custody, Deir and Timothy Ferguson approached and intimidated Individual A in an attempt to dissuade him from complying with the grand jury subpoena. *Id.* Notably, the incident was captured on security video and portrayed Deir taking pictures of Individual A's subpoena, and then using the text-message function on his phone. *Id.* at 3. Deir and Timothy Ferguson were later charged with one count of endeavoring to interfere with a grand jury investigation. *Id.* About ten days later, on November

17, 2018, Terry Ferguson—who was no longer in custody—appeared at Individual A's workplace and had a similar interaction and was ultimately also charged with interfering with a grand jury investigation. *Id.*

On January 25, 2019, the government executed a search warrant on Deir's home and found two text messages that Deir sent to co-defendant Terry Ferguson's attorney, Brindley, during the incident described above. *Id.* at 3-4. (The government did not discover any response by Brindley to Deir. *Id.* at 4.) Based on those communications, the government sought to disqualify Brindley as Terry Ferguson's attorney because Brindley was a "potential fact witness and [could] be called to testify at trial." *Id.* at 1. In its motion, the government argued that Brindley's testimony would be important to establish that (1) Deir knew that his intimidation of Individual A was directly related to the investigation of Terry Ferguson, Brindley's client; and (2) Deir was not acting under "advice of counsel." *Id.* The government argued that, as "a fact witness, Mr. Brindley cannot also serve as counsel for Deir's co-defendant, Terry Ferguson." *Id.*

On March 7, 2019, the district court granted the government's motion and disqualified Brindley as Terry Ferguson's attorney. However, on October 8, 2019, after Ferguson's co-defendants pled guilty, Brindley filed a motion to reenter his appearance for Terry Ferguson, contending that the conflict had resolved. *Id.*, Dkt. 198. The government informed the Court that it did not oppose the motion. *Id.*, Dkt. 202. The government explained:

> Up until defendants' guilty, the government believed that Mr. Brindley was a fact witness and might be called by the government to testify at

> trial . . . All of the defendants in this case have pleaded guilty to a misdemeanor charge. In other words, there will be no trial in this case. The government no longer has a reason to call Mr. Brindley as a witness. The *concern that served as the basis* for the government's disqualification motion no longer exist, nullifying the potential conflict of interest.

*Id.* at 6 (emphasis added). In short, because the other co-defendants in *Ferguson II* had pled guilty, the government no longer had a need to call Brindley as a witness, thereby extinguishing the conflict.

## III. DEFENDANT'S MOTION FOR ACQUITTAL LACKS SPECIFICITY AND SHOULD BE DENIED.

In addition to the Rule 33 motion for new trial (discussed below), defendant also moves for acquittal pursuant to Rule 29. R. 456. In support of his motion, however, he states only that "[i]t is the defendant's contention that the government's evidence could not establish to a reasonable jury that each and every element of the offense was proven beyond a reasonable doubt." R. 456 at 2. Defendant does not cite to the record, does not argue how the evidence was deficient or how the government failed to meet its burden, and does not specify which elements, specifically, the government failed to prove beyond a reasonable doubt.[2] Defendant fails to even *recite* the elements of the offense of conviction. And in the next paragraph, defendant seeks to "incorporate[ ] by reference all pretrial and trial objections he made during these proceedings, the points of law, and the bases articulated therein." *Id.*

---

[2] While one might presume that defendant is arguing that the government failed to prove *every* element beyond a reasonable doubt, that argument is simply not supported by the record. For example, there was little-to-no disagreement that the substance at issue for the count relating to Miller was, in fact, fentanyl. *See*, Tr. 466-520 (Unrebutted testimony of DEA forensic chemist Timothy Anderson who examined and tested the fentanyl recovered from defendant's vehicle).

Defendant's bare allegation that the evidence was insufficient to support the jury's verdict is nowhere close to sufficient to address the "nearly insurmountable hurdle" a defendant faces when contending that the jury had insufficient evidence to find him guilty. *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (internal marks omitted).

The Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived. *See United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) ("As we have said numerous times, underdeveloped arguments are deemed waived[.]") (internal quotation marks omitted); *see also Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("Merely reciting the Rule 59(a) standard and then tossing the motion into the court's lap is not enough. Failure to adequately present an issue to the district court waives the issue on appeal."). Additionally, "arguments incorporated by reference are inadequate and undeveloped and are therefore waived." *United States v. Williams*, 218 F.Supp.3d 730, 741 (N.D. Ill. 2016) (citing *United States v. Paz-Alvarez*, 799 F.3d 12, 31 (1st Cir. 2015)). As the Seventh Circuit has said, "it is not this court's responsibility to research and construct the parties' arguments." *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011).

Even if this Court were inclined to consider defendant's cursory and undeveloped claims, this Court should deny his motion. When considering a motion to dismiss pursuant to Rule 29, the court must "afford great deference to jury verdicts,

view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor." *United States v. Brown,* 973 F.3d 667, 681 (7th Cir. 2020) (citing *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019)). The jury's verdict may be set aside on the grounds of insufficient evidence "only if no rational trier of fact could have agreed with the jury." *Brown,* 973 F.3d at 681 (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

Indeed, the jury's verdict was supported by credible and reliable evidence, including: (1) testimony of two cooperating defendants; (2) testimony from several law enforcement officers who participated in the surveillance of defendant and who participated in the pursuit of defendant and ultimate seizure of drugs from defendant's vehicle; (3) video surveillance footage of defendant, his vehicle, and a cooperating defendant placing the drugs inside of defendant's vehicle; (4) testimony from a drug trafficking expert; and (5) testimony from a drug chemist.

For example, Castaneda testified at trial that he had known defendant for four or five years as of 2016 and sold what he thought was heroin—but turned out to be fentanyl—to defendant on April 13, 2016. Tr. 557-58. Castaneda also testified that he and defendant started exchanging text messages to set up the April 13, 2016, drug deal on or around on April 11, 2016. *Id.* 558. According to Castaneda, Castaneda, defendant, and Godina (who was serving as Castaneda's courier) agreed to meet near the Aurora Outlet mall on the morning of April 13, 2016, where Castaneda and Godina would "front" or deliver five kilograms of heroin to defendant on consignment. *Id.* 527-28, 561, 859-60. Although the original plan was to have Godina deliver the

drugs to defendant at the outlet mall, defendant called Castaneda to change the location of the meeting and exchange. *Id.* 563-64. The three individuals—all of whom were driving separately—ultimately agreed to conduct the transaction at a gas station just north of the outlet mall. *Id.* 564-65.

Surveillance cameras outside the gas station captured all three vehicles pull into the gas station at roughly the same time. GX 203. After defendant, who was driving a black minivan, parked his car at a gas pump, he opened the rear passenger door of his van and then walked toward the gas station convenience store. *Id.* Immediately after walking away, Godina pulled up in his car, parked, and retrieved a black bag from his trunk. *Id.* Godina then walked over to defendant's van, placed the black bag into the van, and closed the van door. *Id.* At trial, Godina explained that he placed the black bag containing drugs into defendant's van, knowing that defendant was the intended customer. Tr. 982-86. Castaneda also testified that he instructed Godina to deliver the drugs to defendant. *Id.* 561.

While Godina was placing the bag containing drugs into defendant's van, defendant and Castaneda met inside the gas station convenience store. GX 202, 204. Castaneda testified that, inside of the convenience store, he gestured to defendant that Godina had placed five kilograms of drugs in defendant's van. Tr. 570-71; *see also* GX 202. A few minutes later, Castaneda and defendant left the convenience store and walked back toward defendant's van. Tr. 572; GX 203. Defendant eventually got back into his van and drove away. A few minutes after defendant left, Castaneda called defendant because Castaneda suspected that law enforcement had

been surveilling them at the gas station, and he warned defendant that law enforcement might be following defendant. Tr. 575-76. Of course, Castaneda was correct.

At trial, the jury heard from several law enforcement officers who were conducting surveillance on Castaneda and Godina on April 13, 2016, and who saw Godina place the black bag into defendant's van. For example, Berwyn Police Department Commander Frank Teutonico testified that he was one of the law enforcement officers tasked with conducting surveillance on Castaneda and Godina—who, at that point, were already targets and known drug dealers—on April 13, 2016. Tr. 281, 286, 310. While conducting surveillance, Commander Teutonico observed Godina park near a then-unknown black minivan at a gas station in Aurora, Illinois. *Id.* 311-12. Commander Teutonico then observed a black male—later identified as defendant—exit the minivan and walk away from the van. *Id.* 313. A short time later, Commander Teutonico observed Godina grab a black messenger bag from his own trunk, walk over to the black minivan, and then place the bag into the minivan. *Id.* 314-15.

Another law enforcement officer, DEA Special Agent Robert Fergus, testified that he, too, was conducting surveillance on Castaneda and Godina in Aurora on April 13, 2016. Tr. 1130-31. Agent Fergus testified that he followed the minivan driven by defendant after defendant exited the gas station convenience store and left the gas station with the bag full of drugs already in his van. *Id.* 1135-36. Agent Fergus followed defendant from the gas station to Interstate 88 heading east toward the city.

*Id.* 1136. Agent Fergus testified that he observed defendant exit I-88 at Route 59. *Id.* at 1136-37. At that point, Agent Fergus lost defendant.

However, FBI Special Agent William Roecker was also following defendant on I-88 heading east. *Id.* 1121. According to Agent Roecker, defendant took the Route 59 exit from I-88 and headed north. *Id.* From there, Agent Roecker followed defendant north on Route 59 until defendant made a right turn onto Westings Avenue, heading east. *Id.* 1123. Agent Roecker followed defendant and also made a right turn onto Westings Avenue. *Id.* However, when Agent Roecker turned onto Westings Avenue, he observed defendant (who made a U-turn on Westings Avenue), heading past Agent Roecker in the opposite direction toward Route 59 again. *Id.* 1123-24. Agent Roecker then made a U-turn to follow defendant back to Route 59, and when he did, he observed defendant driving south on Route 59 headed back to I-88. *Id.* 1125. As argued to the jury, defendant was clearly attempting to lose his tail. *Id.* 1429.

When defendant got back onto I-88, Agent Fergus reestablished surveillance and followed defendant as defendant headed east. *Id.* 1138. Agent Fergus followed defendant as defendant exited at Naperville Road and then make a right turn at Freedom Drive. *Id.* at 1139. Agent Fergus observed defendant make another right turn at Independence Avenue into a strip mall. *Id.* 1140. At that point, Agent Fergus saw defendant's minivan parked on the north side of a restaurant in the strip mall and observed defendant walking away from the van. *Id.* 1140-41. Agent Fergus testified that he saw defendant meet up with another individual a few minutes later

in a different part of the parking lot. *Id.* 1141. Castaneda testified that he, in fact, was the individual who met up with defendant in the strip mall parking lot after defendant abandoned the van. *Id.* 577-78. After defendant abandoned the van, law enforcement approached the vehicle, searched inside, and recovered the black messenger bag containing the fentanyl. Tr. 319-20; *see also* GX 323-24.

In summary, the evidence was overwhelming, and defendant's Rule 29 motion should be denied.

## IV. DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL LACKS MERIT.

### A. Legal Standard

A court may vacate a judgment and grant a new trial upon a defendant's motion "if the interest of justice so requires." Fed. R. Crim. P. 33; *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). A new trial is in the interest of justice where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). Granting a new trial in the interest of justice is "reserved for only the most extreme cases," and courts approach such motions "with great caution." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (quoting *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012)). That is because courts are "wary of second-guessing the determinations of both judge and jury." *Id.* (quoting *Hagler*, 700 F.3d at 1101); *see also United States*

*v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.").

Defendant's Rule 33 motion is based entirely on his argument that there existed an "undisclosed and unwaived conflict of interest," which violated defendant's Sixth Amendment right to conflict-free counsel. Mot. at 1. In order to succeed on his motion, defendant must establish both an actual conflict *and* that it caused an adverse effect on Brindley's performance. *United States v. Coscia*, 4 F.4th 454, 475 (7th Cir. 2021) (citing *Mikens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)). Here, defendant has failed to establish that an actual conflict existed. But even if he could clear that hurdle, he has not shown that the alleged conflict adversely affected Brindley's performance in this case, and the record would disprove such a claim. Accordingly, defendant's motion should be denied.

### B. Defendant Cannot Establish Ineffective Assistance of Counsel Where There Was No Actual Conflict of Interest.

"Criminal defendants are guaranteed effective assistance of counsel at all stages of the proceedings against them." *Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004) (citation omitted). "This right includes the right to representation that is free from conflict of interest." *Id.* (cleaned up); *Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013) ("The Sixth Amendment right to effective assistance of counsel encompasses a correlative right to representation that is free from conflicts of interest." (cleaned up)).

There are two analytical frameworks for analyzing ineffective assistance of counsel claims based on an alleged conflict of interest. *Blake*, 723 F.3d at 880. The

first framework, which applies if defense counsel was faced with a choice between advancing his own interests above those of his client and therefore labored under an "actual" conflict of interest, necessitates the showing of an "adverse effect" on the attorney's performance. *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980)); *Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011); *Hall*, 371 F.3d at 973; *Stoia v. United States,* 22 F.3d 766, 771 (7th Cir. 1994)). A movant may show an adverse effect by demonstrating "that there is a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest." *Id.* (cleaned up). Under the second framework, where there has been no "actual" conflict of interest alleged or shown—that is, where only a "potential" conflict is claimed—a movant must establish that the conflict resulted in ineffective assistance according to the more demanding standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

Under that standard, the movant must demonstrate "that counsel's representation fell below an objectively reasonable standard of care, and that there is a reasonable probability that but for counsel's unprofessional errors the trial outcome would have been different." *Id.* (cleaned up). Here, defendant's motion appears to seek relief under the first framework. *See* Mot. at 9 (A showing of an actual and adverse effect "is not as difficult [a standard] to meet as the *Strickland* [ ] prejudice standard."). Accordingly, he must show both that (1) Brindley had an actual conflict of interest in his case, and (2) it adversely affected Brindley's performance. He can do neither.

"An *actual* conflict exists when an attorney actively represents incompatible interests; it is more than a mere theoretical division of loyalties." *United States v. Fuller*, 312 F.3d 287, 291 (7th Cir. 2002) (emphasis in original) (cleaned up). In other words, "an actual conflict exists if an attorney is torn between two different interests, or required to make a choice advancing his own interests to the detriment of his client's interests." *United States v. Wright*, 85 F.4th 851, 859 (7th Cir. 2023) (cleaned up); *see also Hall*, 371 F.3d at 973 ("[A]n actual conflict exists if the defense counsel was faced with a choice between advancing his own interests above those of his client.").

The Seventh Circuit has explained that "[i]nvestigation of a defense counsel, without more, is insufficient to demonstrate an actual conflict of interest." *United States v. Hubbard*, 22 F.3d 1410, 1418 (7th Cir. 1994) (citing *United States v. Balzano*, 916 F.2d 1273, 1293 (7th Cir. 1990)). *See also United States v. Montana*, 199 F.3d 947, 949 (7th Cir. 1999) ("The mere fact of being under investigation by the prosecutors of the lawyer's client does not create a fatal conflict." (citing cases)). Rather, a pending federal investigation presents—at most—a "*potential* conflict of interest." *See United States v. Lowry*, 971 F.2d 55, 61 (7th Cir. 1992) (emphasis added).

Where "a defendant asserts that an investigation into the criminal activities of his counsel creates a conflict between the defendant's interest in effective representation and the attorney's interest in protecting himself from the investigation," the Seventh Circuit has explained that "an actual conflict arises 'only

where there is a danger that [counsel] would ineffectively represent his client because of fear that authorities might become aware of the attorney's own misconduct if he undertook effective representation.'" *Blake*, 723 F.3d at 881 n.10 (quoting *Balzano*, 916 F.2d at 1293). And, similarly, the Seventh Circuit has explained that a criminal investigation into a defendant's lawyer also "can create a conflict of interest" because it "may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer." *Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir. 1992); *see also Lowry*, 971 F.2d at 61 (potential conflict arises because it is "possible that as a result of the pressure of being investigated, [defense counsel] would either refrain from aggressive cross-examination during the trial in order that he might gain the favor of his potential prosecutors, or that he would be unduly hostile toward them, losing objectivity, and thus harm [defendant's] rapport with the jury"). However, the Seventh Circuit has found that where, as here, the investigation into the attorney is conducted by a U.S. Attorney's Office *different* than the one prosecuting his client, the attorney "would have no basis on which to fear" incriminating himself, nor would he be "incented to pull punches in [his client's] defense." *Blake*, 723 F.3d at 881 n.10; *see also United States v. Zepeda*, 2011 WL 2037011, at *11 (N.D. Ind. May 24, 2011) ("there is much less potential for a conflict of interest" if the defendant and attorney are being investigated and prosecuted by different offices).

Here, defendant cannot establish an actual conflict within these parameters—nor does he even assert one that satisfies the proper framework. As an initial matter,

the investigation into Brindley cited in defendant's motion was closed as of December 2021—nearly 36 months before defendant's June 2024 trial in the instant case—and conducted by the U.S. Attorney's Office in the Northern District of Indiana. *See*, Ex. A. And while defendant makes much of the fact that ATF agents apparently sought Ferguson's cooperation against Brindley in that separate, entirely unrelated case, *defendant's* case was investigated by DEA and FBI, with no involvement by ATF. *See*, Tr. 43-44 (Officer James McGreal testifying that he was a co-case agent of Chicago Strike Force 4, which is a DEA/FBI task force); *see also* Ex. A. As such, defendant has not—and cannot—credibly claim that his and Brindley's interests were "incompatible" or that Brindley was somehow "required to make a choice advancing his own interests to the detriment of his client's interests." *Fuller*, 312 F.3d at 291; *Wright*, 85 F.4th at 859; *United States v. Cirrincione*, 780 F.2d 620, 629 (7th Cir. 1985) ("An actual conflict of interest that adversely affected the defendants' lawyers' performance must be evidenced by specific instances in the record.").

Defendant's motion vaguely asserts that Brindley's "constitutionally defective representation infected his representation of Mr. Miller throughout the case, including plea negotiations, trial preparations, and trial." Mot. 13. But it makes no effort to explain how Brindley's motives diverged from his own, nor how Brindley's plea negotiations or trial tactics were affected by any alleged conflict of interest. In fact, the only concrete action that defendant asserts was motivated by a purported conflict of interest was Brindley's demand for $25,000 prior to his cross-examination Castaneda, one of the cooperating defendants. *Id.* at 16. Standing alone, the fact that

Brindley demanded additional funds during trial to cross-examine the government's cooperator does not evidence a conflict of interest based on a purported pending government investigation. This Court should summarily reject defendant's self-serving attempt to invent a link between the demand and the purported conflict by asserting, without any evidence, that the reason Brindley needed the additional $25,000 was because Brindley "was in trouble with the feds." This assertion is entirely illogical and unsupported by anything that occurred in the real world. *See*, *Martin v. United States*, 789 F.3d 703, 707 (7th Cir. 2015) ("Before requiring the district court to reopen a petitioner's case [for an ineffective assistance of counsel claim], *Gallo-Vazquez* sensibly requires some threshold showing of the evidentiary basis, beyond mere conclusory allegations[.]").

First, Brindley was never charged, and the investigation ended in December 2021—years before this mid-trial interaction with defendant Miller. So, naturally, in June 2024, Brindley had no case to defend or legal bills to pay. Second, Brindley's own explanation was rationally related to the nature and timing of the demand, in that Brindley explained that: "Every trial requires more. Especially when it comes down to two cooperating witnesses. That costs more . . . [M]y handling of the officer [versus Pissetzky's, counsel for Alexander]'s handling of the officer show you why that money is well spent." *Id.* Finally, as the texts themselves foreshadow, Brindley *did* undertake a lengthy cross-examination of Castaneda—lasting two full trial days. *See* Tr. 580-612, 634-98, 874-84.

Defendant does not allege (nor credibly could he) that Brindley "pulled his punches" during the cross examination of Castaneda or of any other witness at trial, including the other cooperating defendant, Godina. *Lowry*, 971 F.2d at 61. To the contrary, as his cross examination of Castaneda showcased, Brindley castigated the government's witnesses, called them liars, and took every opportunity to paint the government in the worst light possible. *See, e.g.,* Tr. 1386-87 ("Mr. Castaneda admitted that he lied. In addition to the big lie in which the officers participated about the photo, Castaneda, he admits that he lies about Scrap [Miller] again and again and again and again. There's no doubt.").

In an effort to manufacture a conflict of interest where none exists, defendant erroneously relies on filings in *Ferguson I* and *Ferguson II* that he takes out of context. He reads the record in those cases to support his claim that the government not only was aware that Brindley had a conflict, but actually agreed that one existed. Mot. 13.[3] Far from it. Read in proper context, the record in those cases entirely undercuts defendant's contrived claim.

For instance, defendant makes much of the fact that on March 24, 2024, the government filed a motion requesting a conflict colloquy in *Ferguson I*. Dkt. 510. Indeed, his Rule 33 motion posits that "[i]f a conflicts colloquy was required in *Ferguson* then, logically, it follows that a conflicts colloquy and waiver was required

[3] To support his argument that the government knew that a conflict existed, defendant makes much of the fact that the prosecutor who charged Ferguson in *Ferguson I* and *II* was the same prosecutor who charged defendant. Mot. at 3-5. That is immaterial. As explained below, defendant fundamentally misunderstands the government's filings in both *Ferguson I* and *Ferguson II*, so the fact that the same prosecutor was involved in all three cases is meaningless.

prior to Mr. Miller's trial." Mot. at 13. But the government has never taken the position that an actual conflict existed in that case. *See, generally, Ferguson I*, Dkt. 497, 517, 521. Rather, in *Ferguson I*, it was *Brindley's* position—set forth in a § 2255 petition—that he provided ineffective assistance of counsel to Ferguson in light of the government's investigation involving both him and that client. Nevertheless, Brindley continued to represent Ferguson in the § 2255 matter, where he was essentially advocating his own ineffectiveness. *See*, Ex. B (June 14, 2024, *Ferguson I* Conflict Colloquy) at 6 ("Brindley: Actually, Judge, I think the real issue that the government raised with the Court of Appeals has to do with just the 2255 itself. Because we're alleging that there are -- *it's a very peculiar kind of 2255*, but it's still an ineffective assistance claim at its core, and so that's the issue that the government raised.") (emphasis added). That *potential* conflict is what the government sought to cure or have Ferguson waive through a conflict colloquy; and the government's position was never that an actual conflict existed between Brindley and Ferguson on account of any investigation conducted by ATF or the Northern District of Indiana. Put simply, the potential conflict arose from Brindley bringing a claim against himself. *Id.* at 7 ("What we have focused on is the very nature of the 2255 being an ineffective assistance of counsel claim. Having that same counsel bring that claim against himself, that's the focus of this colloquy."). The unique and unrelated events of *Ferguson I* do not advance defendant's cause, here.

Defendant's reliance on the government's filings in *Ferguson II* is even more tenuous. In his motion, defendant claims (without credible support) that the U.S.

Attorney's Office in the Northern District of Illinois was investigating Brindley "because the government . . . said so in a 2019 filing when it moved to disqualify Brindley as counsel in *Ferguson II*[.]" Mot. at 4. Not even close. First, as noted above, the U.S. Attorney's Office in the Northern District of Illinois never investigated Brindley in 2019 nor at any other time relevant to defendant's motion. Again, the investigation referenced during the sentencing in *Ferguson I* was led by the Northern District of *Indiana*. *See*, Ex. A. More fundamentally, the government moved to disqualify Brindley as Ferguson's attorney because Brindley was a *witness* in the *Ferguson II* obstruction-of-justice charge, not because of anything related to the investigation conducted by the Northern District of Indiana. It was within *this* context—and not some criminal investigation into Brindley—that the government moved to disqualify Brindley in that case. Indeed, the government acquiesced to Brindley's reentry into the case after the co-defendant's pled guilty, resolving the conflict. *Ferguson II*, Dkt. 202.

Put simply, the events and circumstances of *Ferguson I* and *Ferguson II* did not create any conflict for Brindley in the instant case. As noted, the investigation that came to light during *Ferguson I* concluded in 2021—nearly three years before the June 2024 trial in this case. That investigation was conducted by a different U.S. Attorney's Office than the one who prosecuted the instant case. And ATF Agent Labno—not FBI or DEA, the agencies who investigated defendant Miller—conducted that investigation. Unlike in *Ferguson I*, no agents inquired into Miller's interest in cooperating against his own attorney. And Brindley was in no way implicated in

Miller's case—neither as a witness nor potential target. The cases are nothing alike, and the fact that an ATF agent asked questions of a different Brindley client (Ferguson) in 2018 could not realistically have an adverse effect on defendant Miller's plea negotiations or trial in 2024.

This case is not like *United States v. Lafuente*, 617 F.3d 944 (7th Cir. 2010), on which defendant relies. There, counsel knew that "the *same* U.S. Attorney's Office that was prosecuting" her client simultaneously was investigating her. *Id.* at 944. That generated a *potential* conflict, such that defendant could credibly claim that counsel "had an actual fear of retaliation." *Id.* at 946. Here, defendant has made no such claim, and he cannot credibly do so on these materially distinct facts.

Indeed, and as alluded to in defendant's motion, Brindley was criminally prosecuted in this district in *United States v. Brindley, et al.*, 14 CR 468 (N.D. Ill.). The case was prosecuted by Assistant United States Attorneys from the Eastern District of Wisconsin. *See*, Case No. 14 CR 468, Dkt. 6, 8. During the pendency of that case, it was noted on the record that the United States Attorney's Office for the Northern District of Illinois was recused from the case. *Id.*, Dkt. 63 at 2. It stands to reason then, that, *even if* Brindley thought he was still under investigation as of June 2024 (which, of course, he was not), the United States Attorney's Office for the Northern District of Illinois would, once again, be recused from that investigation and prosecution. *See also Blake*, 723 F.3d at 881 n.10 (where investigation into attorney is conducted by a U.S. Attorney's Office *different* than the one prosecuting defendant, the attorney "would have no basis on which to fear" incriminating himself, nor would

he be "incented to pull punches in [his client's] defense"). Moreover, as set out below, Brindley's representation of Miller—before and after trial—conclusively reveal no actionable fear of offending or provoking the government.

Nor is this case anything like *Thompkins*, 965 F.2d at 332, where defense counsel accepted immunity in exchange for cooperation with the same office that was prosecuting his client, or *Stoia v. United States*, 109 F.3d 392, 396 (7th Cir. 1997), where defense counsel accepted a plea agreement in which he would "cooperate with the federal government as a confidential informant" and "refrain from representing individuals charged with crimes under investigation by the United States Attorney's Office, any federal law enforcement authority . . . or in matters in which the federal government has an interest." Unlike defense counsel in those cases, who created a situation ripe for a conflict by representing a client while under obligation to cooperate with the government, there is no support in the record for the conclusion that defense counsel here could somehow obtain a more favorable situation for himself by jeopardizing defendant's case.

Defendant's reliance on *United States v. Masias*, 2022 WL 474202 (N.D. Ill. Feb. 14, 2022) and *United States v. Galicia*, 2022 WL 103704 (N.D. Ill. Jan. 11, 2022)[4] is equally misplaced. Both *Masias* and *Galicia* were cases where defendants were represented by Brindley, and, in both cases, defendants undertook conflict colloquies because Brindley was under indictment at the time he represented those defendants.

[4] Although defendant cites to *United States v. Galicia*, 2015 WL 5611572 (N.D. Ill. Sept. 23, 2015, the passage cited on page 12 of his motion is from the decision rendered in January 2022—not September 2015.

*Masias*, 2022 WL 474202, at *6; *Galicia*, 2022 WL 103704, at *2. Of course, as noted throughout, no disclosure was made and conflict colloquy was requested by the government in this case because Brindley was *not* under indictment, nor was he under investigation, during the relevant time period in this case. Accordingly, *Masias* and *Galicia* are of no moment.

Similarly, *United States v. Levy*, 25 F.3d 146 (2nd Cir. 1994) is immaterial to the defendant's argument. In *Levy*, the Second Circuit identified four sources of conflict that may have adversely impacted defendant's representation in that case: (1) the lawyer's joint representation of co-defendants within the same case; (2) the lawyer's status as a defendant awaiting his own sentencing in a case brought by the same prosecuting office that charged the defendant; (3) the lawyer's status as a subject in co-defendant's flight from the United States to evade the charge the lawyer was defending him from; and (4) the lawyer's status as a possible witness in the plea negotiations on behalf of the co-defendant who fled the country. *Id.* at 155-56. Suffice to say, *none* of those factors are present in this case. Brindley represented only Miller in this case and not any of his co-defendants; Brindley was not charged or under investigation during plea negotiations or during trial by the U.S. Attorney's Office in the Northern District of Illinois (or Northern Indiana, either, as of December 2021); and Brindley did not negotiate a plea agreement for a co-defendant or assist a co-defendant in fleeing the country.

The fact that Brindley was under criminal investigation, which ended in 2021, by a different investigating agency and a different prosecutorial office, without more,

is simply insufficient to support a claim that a conflict of interest existed during defendant Miller's 2024 trial, much less that a new trial is warranted. Neither the facts nor the law support defendant's claim.

### C. Even Assuming a Conflict of Interest Existed, Defendant Cannot Identify an Adverse Effect Arising Out of That Conflict.

Even if the Court were to find an actual conflict of interest between Brindley and defendant, defendant still cannot establish that the conflict "adversely affected his lawyer's performance." *Burkhardt v. United States*, 27 F.4th 1289, 1295 (7th Cir. 2022) (cleaned up). "An adverse effect can be demonstrated by showing that *but for* the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different." *Coscia*, 4 F.4th at 475 (cleaned up) (emphasis added). In other words, "[t]he defendant must show specific instances where [his] attorney could have, and would have, done something different." *Burkhardt*, 27 F.4th at 1295 (cleaned up). Although not as difficult to meet as the standard for prejudice for typical ineffective assistance of counsel claims under *Strickland*, "demonstrating an adverse effect is nevertheless a significant burden." *Id.* (cleaned up).

Defendant has not identified a single episode of defective performance, nor explained how Brindley's performance would have been different, but for Brindley's knowledge about a years-old investigation. Nor could he on this record, where Brindley aggressively, and ably, represented defendant both before and during trial.

Defendant focuses his motion entirely on the trial, but starting with plea negotiations is illustrative of the deficiencies in defendant's argument. As the Court

is aware, defendant Miller was charged with a drug offense that carried a 10-year mandatory minimum sentence. R. 102. To avoid that penalty, Brindley negotiated a plea agreement by which the government agreed to drop any mandatory-minimum sentence, which would have permitted defendant to seek any sentence, including probation, if the court were to accept his guilty plea. *See*, Ex. C (May 30, 2025, Email); Ex. D (Draft Plea Agreement). After obtaining that government concession, several change-of-plea hearings were scheduled, where defendant was expected to effectuate the agreement. However, defendant himself decided *against* pleading guilty and opted instead to exercise his right to a trial. *See* R. 381, 384, 387, 388, 389. By comparison, co-defendant Alexandar's attorney obtained no such deal for his client, whose only hope of avoiding a mandatory minimum sentence was to prevail at trial. Unsurprisingly, defendant's motion is silent on the favorable plea agreement negotiated by Brindley on behalf of defendant.

Without elaboration or analysis, defendant notes Brindley's lack pretrial motion practice, written witness list, or proposed jury instructions, seemingly in support of an argument that Brindley was ineffective. Mot. at 6. In support of that argument, defendant also cites a pretrial memorandum filed by the government in which "the government indicated that it filed several written motions in limine 'because it was not able to reach counsel regarding pretrial filings.'" *Id.* This argument is misleading at best—the pretrial memorandum cited by defendant was filed in <u>2019</u>, five years before the trial at issue and long before the sentencing in *Ferguson I*. *See*, R. 257. If anything, this *supports* a finding that Brindley's

performance was stylistic and intentional, not the product of fear or worry regarding government retribution. Setting that aside, and as counsel well knows, a "defendant's attorney has . . . no duty to make a frivolous argument; and there is a tactical reason not to make weak arguments[.]" *United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003), *overruled on other grounds by Lockhart v. United States*, 136 S. Ct. 958 (2016).

Significantly, defendant does not even attempt to claim actual prejudice from the failure to file pretrial motions or trial materials, or to connect Brindley's decision not to file any pretrial motions or trial materials to the alleged conflict of interest. Tellingly, co-defendant Alexander likewise did not file any witness list or jury instructions, and Alexander filed just one motion *in limine*: a motion to sever the trial, which was denied. R. 375, 391.

Moreover, although he did not file written responses to the government's motions *in limine*, Brindley actively participated in the final pretrial conference and voiced his objections during the hearing.[5] R. 390, 391. For example, the Court noted that it overruled "*Defendants'* categorical objection to the appearance of government witness DEA SA Wilfred Taylor on a pretrial basis." R. 391 at 2 (emphasis added). Brindley also litigated the jury instructions and was successful in arguing for the inclusion of "mere presence" instruction to argue that the fact that his client's presence with cooperators Castaneda and Godina, alone, was insufficient to find defendant guilty. R. 407 at 23 ("A defendant's presence at the scene of a crime and

[5] All parties were present for the final pretrial conference, except defendant Miller, who asked that his presence be waived. R. 390.

knowledge that a crime is being committed is not sufficient by itself to establish the defendant's guilt.").

Not only has defendant failed to identify any motion that Brindley should have filed—and would have filed, but for the purported conflict—defendant also fails to demonstrate that such motion would have been meritorious. Again, Alexander filed a motion to suppress before trial (R. 192) and a motion to sever his trial from defendant's, both of which were denied, and the outcome was ultimately the same: a guilty verdict. R. 408.

Critically, and as the Court observed firsthand, Brindley zealously advocated on behalf of his client during trial, even raising a *Napue* issue during his cross-examination of Godina, alleging that the government had knowingly presented false testimony. Tr. 1021-26; 1378 ("I did make an objection that the government had violated *Napue* by presenting false testimony at one point in the case. And then they stipulated with me, and that corrected the false testimony."). The government does not concede that the testimony at issue was false and instead maintains that Godina testified based on his recollection of events that occurred 10-to-12 years before trial. Tr. 1090-92; 1380 (The Court: "Cooperators have inconsistency all the time, and the government promptly engaged in a meet-and-confer and engaged in a stipulation."). Nevertheless, that challenge—while meritless, in the government's view—prompted a stipulation. Brindley then argued in his close that the stipulation was evidence that Godina lied during his testimony. Tr. 1366 ("Eventually, after Godina was confronted and the truth started to creep up, what happens? He's caught in a lie, and

then bam, we get an agreement. Stipulation 7, Government Exhibit 312 is a driver's license photo that postdates those interviews in 2017 and 2018.").

Separately, Brindley filed a mid-trial motion to exclude evidence, which the government ultimately agreed not to contest. R. 402; *see also* Tr. 1080 ("And despite the fact that some form of [the challenged evidence] have already been produced, we are making a decision not to seek to introduce those calls in our case in chief."). Put simply, Brindley's trial tactics proved effective, and defendant cannot credibly contend that any choices Brindley made pretrial negatively impacted the result—let alone that such decisions were made because of anything to do with a potential conflict.

To say that Brindley attacked the prosecution's case aggressively would be an understatement. Indeed, the majority of Brindley's closing argument was an attack on the credibility of not only the cooperating witnesses, but of the law enforcement officers who led the investigation. For example, Brindley argued to the jury that the case agent knew that Castaneda lied when asked to identify defendant in a photograph back in 2016, did nothing as Castaneda repeated the lie at trial, and then got caught in the lie by Brindley during cross-examination. Tr. 1367-69, 1390-91 ("But they let [Castaneda] lie, the agents, the officer, because it help."). In fact, Brindley brought up the fact that a criminal complaint against defendant had been dismissed, which, according to Brindley, angered investigators, prompting them to transition away from recorded interviews of Castaneda to unrecorded, "closed door session[s]" where Castaneda "change[d] his story" about defendant and was able to

identify Miller as the man at the gas station. *Id.* 1397-98. Brindley even took the step of arguing to the jury that the investigators lied and "fixed" the case against defendant. *Id.* 1406 ("But it's worse than that. It's worse than just Castaneda lying. It's worse than just them getting him to lie. This is the Strike Force 4 [investigation team] on the witness stand lying to you when the truth is they tried to fix the case. They tried to fix the -- what other excuse is there for this? This is a manipulated, faked, staged photo.").

The jury correctly rejected Brindley's unfounded argument, which had absolutely no basis in fact. But Brindley's trial performance revealed zero fear of invoking the government's ire or "pulling punches" to avoid retaliation. No conflict of interest adversely affected Brindley's representation of defendant.

In any event, the evidence against defendant was overwhelming. As noted above, Castaneda testified that he arranged to give defendant five kilograms of heroin on consignment. After they originally planned to meet at the Aurora Outlet Mall, Castaneda, Godina, and defendant agreed to meet instead at the gas station just north of the mall. Several surveillance officers tracked Castaneda, Godina, and defendant's movement to the gas station and witnessed defendant deliberately open the back door of his minivan as he got out of his van and walked to the gas station. Officers also witnessed Godina place a black messenger back into defendant's van and then close the van door. Surveillance from inside of the gas station showed defendant and Castaneda talking to one another, which clearly demonstrated that they knew each other. Surveillance from outside the gas station showed Castaneda

and defendant continue their conversation right outside of defendant's van until defendant finally drove away from the gas station. And when law enforcement pursued defendant, defendant drove erratically, clearly trying to lose his tail before finally abandoning the van and the drugs. Law enforcement then recovered the messenger bag from inside the van containing the five kilograms of what turned out to be fentanyl—the drugs that defendant arranged to obtain from Castaneda. Defendant has not pointed to anything Brindley did at trial, or beforehand, that caused his client's conviction.

Even if it could fairly be said that a "potential" conflict of interest was present, defendant "must establish that the conflict resulted in ineffective assistance according to the familiar and more demanding *Strickland* standard." *Blake*, 723 F.3d at 880. To prevail under this standard, defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for his counsel's errors, the result of the sentencing proceeding would have been different. *Strickland*, 466 U.S. at 688, 694.

The inquiry under the first component of this test is "highly deferential" to counsel. *Strickland*, 466 U.S. at 689. "[T]here is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *Valenzuela v. United States*, 261 F.3d 694, 698-99 (7th Cir. 2001) (cleaned up). Strategic decisions are not second-guessed on review. *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009). The second component of the *Strickland* test requires the petitioner to establish that he was prejudiced by his counsel's deficient

performance. *Strickland*, 466 U.S. at 687. This requires defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Defendant must satisfy both prongs of the test in order to meet his burden. *Id.* at 687.

For the same reasons that defendant cannot establish ineffective assistance of counsel under the more generous *Cuyler* standard for actual conflicts, he cannot establish ineffective assistance of counsel under the more demanding *Strickland* standard. Defendant has not articulated how Brindley's representation fell below an objectively reasonable standard of care. Indeed, he does not cite a single mishap or blunder—let alone one that fell below the standard of care—that affected the case. Accordingly, his claim of defective counsel fails woefully.

Defendant rejected a favorable plea offer and chose to go to trial. He was convicted, and now, grasping at the thinnest of threads, has woven a tale of alleged conflict that is not supported by the evidence and not sufficient to justify setting aside the jury's verdict in this case. Defendant was aggressively represented by Brindley during a fiercely litigated trial, and he cannot identify a single instance of prejudice he suffered as a result of his representation by Brindley. It is unsurprising that defendant is unhappy with his choices. But he is not entitled to attempt to undo a jury's verdict based on wild speculation and conclusory assertions.

## V. CONCLUSION

For the foregoing reasons, defendant's post-trial motions should be denied.

Dated: March 28, 2025

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: /s/ *Jimmy L. Arce*
JIMMY L. ARCE
Assistant United States Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-8449