IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CR 319 |
| v. | ) | Honorable John Robert Blakey |
| | ) | |
| KEVIN MILLER, JR., et al. | ) | |

**DEFENDANT KEVIN MILLER'S REPLY BRIEF
IN SUPPORT OF HIS RULE 33 MOTION**

*"The fact that* **Mr. Brindley is a subject of the investigation** *creates a conflict of interest and at a minimum requires that defendant [ ] knowingly waives such a conflict."*

–Gov't Br. in *United States Ferguson*, N.D.IL, 18cr858,
ECF No. 74 at 7, n. 3 (emphasis added)

This case is unique because the core facts are largely uncontested:

- First, the government concedes that its investigation of Beau Brindley occurred during Brindley's representation of Defendant Miller. ECF No. 484 at Ex. A.

- Second, the government concedes that no later than October 2023, Brindley became aware that he (Brindley) was the target of a federal investigation authorized by Main Justice.

- Third, the government concedes in its response that it did not inform Attorney Brindley he was no longer under investigation until January 7, 2025—well after Mr. Miller filed the instant post-trial motion. Govt. Resp., ECF No. 484 at Ex. A.

- Finally, the parties do not dispute that Miller never waived his right to conflict-free counsel.

1

Given these facts, the government's response invites this Court to commit reversible error. Defendant KEVIN MILLER, by undersigned counsel MIANGEL C. CODY of TDC LAW OFFICE, respectfully submits this Reply Brief in support of his Rule 33 post-trial motion. In support of this Motion, we state as follows:

1. **Mr. Miller's right to conflict free counsel persists throughout all stages of the criminal proceedings against him.**

   *"Criminal defendants are guaranteed effective assistance of counsel at all stages of the proceedings against them."*

   − *Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004)

The government concedes that Brindley was under DOJ investigation during Miller's federal prosecution. According to the government, Brindley was investigated for "federal tax crimes committed by you within the Northern District of Illinois." Govt. Resp., ECF No. 484 at Ex. A.

When Brindley became aware of the DOJ's investigation is important. Specifically, the government does not dispute that Brindley learned that he was the target of a federal investigation no later than October 20, 2023. Govt. Resp., ECF No. 484 at 5. At that time, Brindley was Mr. Miller's lead counsel in this case.

When Brindley became aware that he was no longer the target of a federal investigation is important too. In its response, the government attaches a letter that is curiously dated January 7, 2025. The letter is from an AUSA in the Northern District of Indiana and addressed to Attorney Brindley.

2



**U.S. Department of Justice**

United States Attorney
Northern District of Indiana

Clifford D. Johnson
United States Attorney

5400 Federal Plaza, Suite 1500          (219) 937- 5500
Hammond, Indiana 46320                   FAX: (219) 852- 2770
                                         TTD: (219) 933- 1250

**January 07, 2025**

Beau Brindley
53 W Jackson Blvd # 1410
Chicago, IL 60604

Re: Federal Tax Investigation

Dear Mr. Brindley:

This letter is to inform you that the United States Attorney's Office for the Northern District of Indiana had an investigation open between June of 2020 and December of 2021 concerning potential federal tax crimes committed by you within the Northern District of Illinois. I am writing to inform you that based on information presently known to the government and the principles of federal prosecution, our office closed this authorized criminal investigation in December of 2021.

This letter should not be interpreted as an exoneration or a "clean bill of health." Additionally, this letter does not confer any protection against future investigative or prosecutorial action with respect to this or any other matter.

This letter does not bind any federal, state, or local law enforcement or prosecuting authority, nor does it address or limit any civil or administrative action that a federal, state, or local authority may pursue with respect to this or any other matter.

Sincerely,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY

By: /s/ Thomas M. McGrath
     Thomas M. McGrath
     Assistant United States Attorney

Tellingly, the government concocted the January 7, 2025, letter to attorney Brindley only *after* Mr. Miller filed his Rule 33 motion—months after Miller's June 2024 trial. More importantly, the letter confirms that the government had *not* informed Brindley, prior to Mr. Miller's trial, that he (Brindley) was no longer under investigation.

The government claims there was no constitutional violation because its Brindley "investigation was long closed by the time of defendant Miller's trial". Govt. Resp., ECF No. 484 at 2. That argument misses the point. The key issue is not when the government concluded its investigation of Brindley, but when it notified Brindley that the investigation had ended.

3

The government informed Beau Brindley that he was the subject of a federal investigation no later than October 2023; and it did not communicate that he was no longer a target until January 2025—approximately six months after Mr. Miller's trial. The government cannot retroactively cure a constitutional violation with a belated and self-serving letter. Furthermore, the January 7 letter certainly does not explain why the government failed to inform Your Honor of the conflict before Miller's trial.

In the government's view, a criminal defendant's Sixth Amendment right to conflict free counsel only applies at trial. This argument also lacks traction. The government does not cite a single case to support its argument that the right to conflict free counsel only applies at trial. The law is well settled; the right to (conflict free) counsel attaches at the *Miranda* warning, and it runs through plea bargaining, just as it does at trial. *Roy v. United States*, No. 17 C 5217, 2018 WL 6696598, at *15 (N.D. Ill. Dec. 20, 2018); *Missouri v. Frye*, 566 U.S. 134, 143 (2012).

Next, the government argues there was no conflict of interest because the DOJ's Brindley investigation was "conducted by the U.S. Attorney's Office in the Northern District of Indiana." Govt. Resp., ECF No. 484 at 20. This statement is demonstrably false.

The facts of the DOJ's Brindley investigation were outlined in Mr. Miller's opening brief. Much abridged, while Mr. Miller's case was pending, an NDIL grand jury indicted a man named Terry Ferguson. Ferguson was charged with drug and gun violations that were unrelated to Miller's case. The NDIL cases against Terry Ferguson were docketed at 18 CR

858 and 18 CR 734.[1] Brindley represented defendant Terry Ferguson and AUSA Matthew Kutcher represented the government in both *Ferguson I* and *Ferguson II* prosecutions.

On October 30, 2018, at the direction and behest of NDIL AUSA Kutcher, federal agents arrested the Ferguson defendant *within the Northern District of Illinois* at his Willowbrook, Illinois home. Agents consulted with NDIL AUSA Kutcher during Ferguson's arrest.[2] During questioning, agents told Ferguson "that investigators believed that he was involved in something shady with his lawyer Beau Brindley" and "by 'shady' they meant criminal." Agents then "asked if Ferguson would be willing to cooperate against Brindley."[3] More specifically, agents "explained that they were interested in cooperating with Ferguson but needed to have a more complete understanding of what Ferguson could cooperate on *in order to convince the United States Attorney's Office to release Ferguson pending his cooperation.*"[4]

Chicago ATF agents then transported Ferguson to the ATF's Chicago Field Office, which is also located *within the Northern District of Illinois*. At the Chicago ATF Field Office, Agents told Ferguson that they were investigating "suspicions that he was involved in criminal activity with his attorney" and "would need more from him in order to convince the USAO

---

[1]  For clarity throughout this motion, undersigned counsel will refer to *United States v. Ferguson*, 18-cr-734-1, (N.D. IL) as "Ferguson I". Counsel will refer to *United States v. Ferguson*, 18-cr-858, (N.D. IL) as "Ferguson II". In both *Ferguson I* and *Ferguson II*, attorney Beau Brindley represented Terry Ferguson and AUSA Matther Kutcher represented the United States.

[2]  *See* Exhibit A: ATF Report of Investigation, prepared by Special Agent Christopher Labno, dated Nov. 19, 2018.

[3]  *See Id.*

[4]  *See Id. at 2* (emphasis added).

that he [Ferguson] would be a valuable cooperator."[5] Finally, agents "told Ferguson they were going to call the USAO" and advised that "the USAO wanted more," before transporting Ferguson to his initial appearance before a magistrate *within the Northern District of Illinois*. The bottom line is that federal agents in NDIL began investigating Brindley in 2018 and conversations about potential cooperation against Brindley occurred at the direction of the NDIL's US Attorney's Office.

What is more, there can be no doubt that the federal crimes subject to the Brindley investigation occurred in the Northern District of Illinois – the government's own belated January 7 letter says as much. The letter indicates: "the United States Attorney's Office for the Northern District of Indiana had an investigation open between June of 2020 and December of 2021 **concerning potential federal tax crimes committed by you within the Northern District of Illinois.**" In other words, the DOJ's January 7 letter confirms what Mr. Miller has argued all along: his lawyer was under DOJ investigation for federal tax crimes that the lawyer purportedly committed within the same district prosecuting Miller.

In any event, the NDIL US Attorney's Office knew the Brindley investigation created an "actual conflict of interest" because it made – and won – that exact argument to disqualify Brindley in *Ferguson II*, a case that was pending in our district. As the government argued in its February 5, 2019, *Ferguson II* filing: **"The fact that Mr. Brindley is a subject of the investigation creates a conflict of interest and at a minimum requires that defendant [] knowingly waives such a conflict."** *Ferguson II*, 18cr858, ECF No. 74 at 7, n. 3. (emphasis

---

[5]     *See* Exhibit B: ATF Report of Investigation, prepared by Special Agent Christopher Labno, dated Nov. 16, 2018.

added). The government cannot have it both ways—claiming its investigation disqualifies a lawyer in one NDIL case, while denying that the same investigation creates an actual conflict in another. This argument infringes on the defendant's right to conflict-free counsel.

Moreover, the government's claim that Brindley was disqualified in *Ferguson II* solely because he was a fact witness is dangerously misleading. First, the government made written representations to Judge Tharp stating that Brindley was "a subject of the investigation," not solely a fact witness. We know Brindley was the target of an investigation—as the government surely concedes—because Main Justice in Washington, D.C., formally approved the investigation. The government cannot credibly argue that such high-level approval would have been required merely to consider Brindley a "witness" in a case. Mr. Miller seeks an evidentiary hearing to develop the record more fully as to precisely when Main Justice authorized its DOJ investigation of Brindley and the NDIL USAO's involvement in the Brindley investigation.

## 2. The caselaw does not require Miller to demonstrate that the DOJ's investigation of Brindley was "related to" Miller's criminal prosecution.

Next, the government asks this Court to overlook the Sixth Amendment problem in this case because the DOJ's Brindley investigation "involved wholly distinct circumstances with no connection at all to Miller." Govt. Resp., ECF No. 484 at 2. Again, the government cites no caselaw to support this argument. The Seventh Circuit has never held a criminal defendant must show there is a factual nexus between the crime for which he is charged and the investigation of his attorney.

Rather, in *Lafuente v. United States*, a defendant convicted of drug and weapons offenses sought habeas relief after learning his counsel was under investigation for harboring an alien

in an unrelated matter. 617 F.3d 944, 945 (7th Cir. 2010). The *Lafuente* defendant's conviction was wholly unrelated to the matter for which his lawyer was under federal investigation. However, the Seventh Circuit held that the conflict was no less concerning, stating: "Lafuente's allegations, if believed, entitle him to relief. If a criminal defendant's attorney is under investigation by the prosecutors of her client, there is a conflict. *Id.* at 946 (citing *United States v. Lowry,* 971 F.2d 55, 61 (7th Cir.1992); *Thompkins v. Cohen,* 965 F.2d 330, 332 (7th Cir.1992).

Counsel notes that the factual issues concerning the DOJ's Brindley investigation raised in the instant motion overlap with questions of fact briefed and pending before Judge Kennelly in *United States v. Ferguson,* 18 CR 734. Judge Kennelly has taken the Ferguson defendant's habeas petition under advisement. Undersigned counsel understands that Court's findings in *Ferguson* may obviate or substantially narrow the need for an evidentiary hearing on Mr. Miller's motion.

## CONCLUSION

Admittedly, retrying a case is never ideal. But we are here because the government failed to disclose a potential attorney conflict to the Court and to Mr. Miller before trial. The proper course would have been for the Court to conduct a conflicts colloquy, ensuring that Mr. Miller was informed of the issue and given the opportunity to knowingly waive the conflict or proceed with different counsel. Instead, the government remained silent. The Sixth Amendment demands more.

Respectfully submitted,

By: _____

8

MIANGEL C. CODY
*Counsel for Kevin Miller*

TDC LAW OFFICE
1325 S. Wabash Ave., Suite 305
Chicago, IL 60605
(312) 858-8333

## **CERTIFICATE OF SERVICE**

The undersigned attorney, MiAngel Cody, hereby certifies that the following document:

### **DEFENDANT KEVIN MILLER'S REPLY BRIEF**
### **IN SUPPORT OF HIS RULE 33 MOTION**

was served on April 15, 2025, in accordance with Fed. R. Civ. P. 5 and applicable local rules pertaining to Electronic Case Filing (ECF), pursuant to the district court's ECF system as to ECF filers and was sent by first-class mail or by hand delivery to non-ECF filers, if any.

/s/ MiAngel Cody
<u>MIANGEL CODY</u>

THE DECARCERATION COLLECTIVE
LAW OFFICE
1325 S. Wabash Suite 305
Chicago, IL 60605

*Counsel for Kevin Miller Jr.*

Exhibit A:

ATF Report of Investigation, prepared by Special Agent Christopher Labno, dated Nov. 19, 2018.

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| | | 172 |

## SUMMARY OF EVENT:

Execution of arrest warrant (18CR734) at ▮▮▮▮▮▮▮▮ Willowbrook, Illinois.

## NARRATIVE:

1. **ARREST WARRANT:** On October 30, 2018, at approximately 06:00 hours, ATF Agents and Illinois State Police (ISP) along with Officers from Channahon, Naperville, Hodgkins and Kenosha executed a federal arrest warrant (18CR734) and later federal search warrants 18M689 and 18M684 issued from the Northern Judicial District of Illinois. The arrest warrant authorized the arrest of Terry FERGUSON, white male, DOB: ▮▮▮▮▮▮▮▮▮▮▮▮ and the search warrants authorized agents to search the residence of FERGUSON located at ▮▮▮▮▮▮▮▮ Willowbrook, Illinois, as well as FERGUSON's cellular telephone respectively. Present during the execution of these warrants was ATF Special Agents (S/A's) Christopher J. Labno, Christopher Burney, Madison Johnson, Brett O'Connor, Craig Fries, Group Supervisor Bennie Mims and Task Force Officers Walter Bucki, Christopher Stenzel and Sargent Thomas Hamilton, along with ISP Lt. Callaghan, Inspector Chris Linares and S/A Kaney, Troopers Peters, Kranc and Heenan, Channahon Deputy Chief Gunty, Detective McClellan and Sargent Brooks, Naperville Sargent Black, Detectives Elliot and Stahulak, Hodgkins Sargents Heller and Miller and Kenosha Wisconsin Police Officers Jon Hasselbrink and Kris Schwartz.

2. At approximately 06:00 hours on this same date, Agents and Officers including Willowbrook Police and DuPage County Sheriff marked units, approached ▮▮▮▮▮▮▮▮▮▮ Willowbrook, Illinois. Agents and Officers announced their office and purpose, ringing the door bell and pounding on the door. After waiting for reasonable amount of time with no response, Agents observed lights turn on in the house and a minor female child open the front door of the residence. Agents then made entry and conducted a security sweep of the residence. During this security sweep S/A Burney observed FERGUSON exit the master bedroom on the second floor and begin to descend the stairs to the first floor. Agents then placed FERGUSON under arrest, handcuffed (double-locked). During a search of FERGUSON incident to arrest, Agents found a large bundle of United States Currency (USC) from both pockets of his jeans; while FERGUSON was initially allowed to maintain custody of this currency, it was later counted and seized by S/As Labno and Burney who found it to be a total of $3,466.98. Agents subsequently returned $1.98 in coin to FERGUSON's wife Cherie FERGUSON (see attached receipt).

| Prepared by: Christopher J. Labno | Title: Special Agent, Chicago I Field Office | Signature: | Date: 11·19·18 |
|---|---|---|---|
| Authorized by: Bennie Mims | Title: Group Supervisor, Chicago I Field Office | Signature: A/GS Matthew Jones | Date: 11/19/18 |
| Second level reviewer (optional): Celinez Nunez | Title: Special Agent in Charge, Chicago Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001895



3. During the security sweep, Agents also encountered Cherie FERGUSON, as well as █████████████████████████

4. In addition, during this security sweep, S/A Labno observed an Ariens Gravely Pro-Turn 260 riding lawnmower in the residence's garage. S/A Labno recognized this lawn mower as being stolen from Ariens Company Distribution Center located at 3737 84th Avenue, Kenosha, Wisconsin on April 24, 2018. The delivery of this equipment to FERGUSON at the Sunset residence by Joe RUSSO on April 30, 2018 is documented in a separate Report of Investigation (ROI). Kenosha Wisconsin Detectives Jon Hasselbrink and Kris Schwartz subsequently examined this piece of Ariens Gravely Pro-Turn equipment and viewed the serial number of the unit which was in plain view. Officers Hasselbrink and Schwartz were able to confirm that this serial number 070677 and model number 992269 was indeed stolen from an interstate shipment as described above. Officers Hasselbrink and Schwartz subsequently spoke with Cherie FERGUSON who agreed to allow these Kenosha Officers a limited consent to search for the stolen Ariens Gravely lawn equipment described above and Officers recovered this machine and transported it back to Kenosha, Wisconsin. Reference should be made to the attached Kenosha, Wisconsin Police Department Report Number 2018-00320025 for more information.

5. Once the premises were secure, S/A Labno spoke with Assistant United States Attorney Matthew Kutcher who advised that US magistrate Judge Cole had scheduled a meeting to sign a search warrant for 8████████ Willowbrook, Illinois for later this same date. S/A Labno should note that this search warrant (18M689) was subsequently signed at 13:00 hours on this same date, and that the execution of this search warrant is documented in a separate ROI.

6. At approximately 06:15 hours, S/As Labno and Burney approached FERGUSON and FERGUSON asked if S/A Labno could get him a shirt. S/A Labno got FERGUSON a shirt and asked if FERGUSON recognized S/A Labno. FERGUSON stated that he did recognize S/A Labno and understood he was in trouble. FERGUSON then asked to speak with Agents outside the residence.

7. Once outside the residence, Agents sat inside a government vehicle with FERGUSON and had a brief conversation. Specifically, S/A Labno advised FERGUSON of his rights pursuant to ATF form 3200.2. Specifically, S/A Labno read FERGUSON each of his rights and explained them, asking FERGUSON if he understood them. FERGUSON stated that he understood his rights and was willing to waive them and speak with Agents. At this point, Agents explained to FERGUSON that he was in custody for selling cocaine and FERGUSON stated I understand, I knew who you were. S/A Labno explained that other arrests were being made this same morning and search warrants executed. FERGUSON then related that he knew that he was in trouble and would help Agents one thousand percent. S/A Labno explained to FERGUSON that they were interested in obtaining his proactive cooperation. FERGUSON told Agents, "tell me what you want. It's all on the table." S/A Labno asked FERGUSON if he knew DOMINGUEZ's friend "Mark Anthony and his brother Mike." FERGUSON responded, "you know I do." FERGUSON then advised that he was willing to cooperate against the VELASQUEZ brothers saying—"everything's on the table."

8. FERGUSON then asked, "what are you going to do for me? I'm still in these cuffs and sitting here." FERGUSON then explained that he did not want to be sitting in front of his house in handcuffs and that the longer Agents had him there in that condition, the more likely he was to be unable to cooperate as everyone would know. Agents agreed and explained that they were interested in cooperating with FERGUSON but needed to have a more complete understanding of what FERGUSON could cooperate on in order to convince the United States Attorney's Office to release FERGUSON pending his cooperation. FERGUSON stated, "What do you need. I already told you Im with it a thousand percent. I'm not going anywhere, if you've been

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001896

  
investigating me you know that." S/A Labno stated that he understood that but that the USAO would ask for specifics. S/A Labno then asked if FERGUSON was willing to make buys of narcotics from his drug suppliers. FERGUSON stated that this would be easy. Agents told FERGUSON that they were also interested in buying illegal guns. FERGUSON indicated that while not as easy as drugs, "that can still happen." S/A Labno then told FERGUSON that investigators believed that he was involved in something shady with his lawyer Beau (BRINDLEY). FERGUSON replied, "Yeah?" Agents then indicated that by "shady," they meant criminal conduct. FERGUSON responded, "Yeah, like I said everything is on the table." S/A Labno again stated that the USAO would want specifics before they would agree with Agents to release FERGUSON. S/A Labno asked FERGUSON if he (FERGUSON) had BRINDLEY "dead to rights" on criminal conduct. FERGUSON responded, "I believe I do." Agents then asked if FERGUSON would be willing to proactively cooperate against BRINDLEY as well as the other individuals whom they discussed. FERGUSON stated that he would, saying, I told you I'm with you a thousand percent."

9. The conversation then turned to the impending search of the Sunset residence. Agents explained that they were waiting for a judge to sign a search warrant for this residence. Agents advised that if FERGUSON was willing to consent to a search of the residence he could do so. FERGUSON explained that he understood that Agents "had to do what they had to do," but that if Agents continued the heavy police presence and searched the residence his cooperation was at an end. FERGUSON stated that he was willing to cooperate because he got himself in this situation and did not want his family to suffer. In response to S/A Burney's questions, FERGUSON stated that there was "nothing in the house." FERGUSON stated, "You can look, you can run the dog through." FERGUSON stated that while there was nothing in the house, he did not want Agents tearing apart his residence while his family was there. S/A Labno then asked FERGUSON if he had any money in the residence, and FERGUSON responded that he had about $18,000. In United States Currency (USC) in the headboard of his bed. FERGUSON further explained that it was wrapped in a towel or shirt.

10. With regard to what Agents would find in other addresses where they were conducting searches FERGUSON explained that there was nothing in [redacted] 72nd Street. In response to Agents questions, FERGUSON stated that he did not own 7[redacted] 72nd Street and that KM and F owned that residence. S/A Labno asked FERGUSON what KM and F stood for and who owned that company; FERGUSON responded, "look it up." S/A Labno indicated that he was aware FERGUSON's son, Tim FERGUSON, resided at that address and that Agents would seek to search the house. FERGUSON replied, "There's nothing in that house." S/A Labno asked, "What about the garage?" FERGUSON initially replied that Tim FERGUSON did not have control over the garage or the house and that KM and F owned that house. FERGUSON then stated, "Everything in the garage is mine." S/A Labno then asked what FERGUSON meant and FERGUSON stated, "All the stuff that's in the garage there [redacted] is mine. In response to Agents questions, FERGUSON stated that there was about "a pound of weed and some other things" in the garage. S/A Labno asked were the "things" were and FERGUSON responded, "the cabinet."

11. At this point, FERGUSON renewed his request to be released and start cooperating with Agents. FERGUSON stated, "You really don't have me on much." S/A Labno asked FERGUSON when was the last time he sold cocaine? FERGUSON responded, "It's been awhile." Agents responded, "Yeah, like a week." Agents then told FERGUSON that they wanted to take him to their office to talk further about his pending cooperation and FERGUSON agreed. FERGUSON then advised that he wanted the police to leave his house and not further upset his family. S/A Labno explained that the police presence would be dramatically scaled back and that his family and children were free to go wherever they wanted and that Agents would help them get rides to school and help his (FERGUSON's) wife get the other children where they needed to go. FERGUSON thanked Agents and expressed a desire to quickly move forward with his cooperation. S/A Burney then explained that Agents had a search warrant for FERGUSON's cellular telephone. FERGUSON told Agents that the phone

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001897



| Title of Investigation: | | Location Number: | Report Number: 172 |
|---|---|---|---|

was on or next to his bed. Agents asked if there was a code on the phone. FERGUSON stated, "No, it's unlocked."

12. At this point, S/A Labno introduced FERGUSON to S/As O'Connor and Fries. S/A Labno explained that Agents O'Connor and Fries would transport FERGUSON to the ATF office where S/As Labno and Burney could conduct a further interview with FERGUSON. FERGUSON stated that he agreed and wanted to get off-scene as quickly as possible. FERGUSON again repeated that he was willing to work with Agents 1001% and do everything he could to help Agents' investigation. Agents O'Conner and Fries then transported FERGUSON to the ATF office where he was secured in an interview room and provided a bottle of water.

13. At this point, S/As Labno and Burney approached Cherie FERGUSON to conduct a brief interview. S/A Labno advised Cherie FERGUSON that she did not have to speak with Agents and that she was free to leave the residence. Cherie FERGUSON explained that she understood her rights and wanted to cooperate with Agents. In response to S/A Labno's questions, Cherie FERGUSON advised that her marriage to her husband Terry was "only on paper" and that it had become a marriage of convenience. Cherie FERGUSON stated that she slept in her son's bedroom and that Terry FERGUSON would leave the house everyday at 8 a.m. and return at 10 p.m. and that she did not know what he did or where he went during those hours. Cherie FERGUSON stated that she and her husband Terry kept separate finances and that she made a salary of approximately one hundred fifty-seven thousand dollars and that she used this money to pay household expenses, pay the mortgage and any other expenses.

14. Cherie FERGUSON stated that she did not give Terry money for his work or much else and that he worked rehabbing houses. Cherie FERGUSON stated that she completed the joint tax return which she filed for herself and Terry FERGUSON and that she based these tax filings on her W2 and whatever information Terry FERGUSON provided to her. S/A Labno stated that for the last five to six years Terry FERGUSON had claimed that his remodeling business had lost money each year and that this was what she reported on the tax returns. Cherie FERGUSON stated that her husband Terry did not keep accurate records or receipts and that he merely told her what to file and that she believed that he lost money. Cherie FERGUSON also stated that FERGUSON had rental properties and derived income from these sources. Again, S/A Labno advised that for the last five or more years the FERGUSON's had reported a loss from rental properties on their tax returns. Cherie FERGUSON explained that this was possible as many of the rental properties owned by her husband were in terrible neighborhoods and that when a tenant moved out he often had to gut the structure because of destructive tenants. With regard to United States Currency (USC) in the residence, Cherie FERGUSON stated that she had no cash money in the residence and that any money found in the residence wasn't hers or her children's. Cherie FERGUSON explained that she did not know her husband to have any money in the house. Cherie FERGUSON stated that if they had any extra money it went to pay off college loan debt generated by her older children. S/A Labno advised that Terry FERGUSON had already told Agents that he had approximately $18,000 in cash bundled into a brick in the upstairs master bedroom. Cherie FERGUSON denied any knowledge or ownership of this money.

15. At this point S/A Burney explained to Cherie that they had a federal search warrant for Terry's cellular phone. S/A Burney told Cherie that during an earlier conversation with Terry, he told Agents that his phone was located on or near his bed. Agents then followed Cherie FERGUSON as she went upstairs to the bedroom that Terry sleeps in and pointed out Terry FERGUSON's cellular telephone. S/A Burney then recovered Terry's black iPhone which was named in the search warrant. S/A Burney was able to access FERGUSON's iPhone, as it was unlocked, as stated earlier by FERGUSON.

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001898

  

| Title of Investigation | | | Investigation Number | Report Number: 172 |
|---|---|---|---|---|

S/A Burney also observed, in plain view, a bulky white wrapped up t-shirt on top of the headboard that matched the description FERGUSON gave to Agents earlier, which contained $18,000 in cash, according to FERGUSON.

16. S/A Burney and Cherie FERGUSON then returned downstairs. Agents then asked if Cherie FERGUSON had been prescribed opioid painkillers and Cherie FERGUSON advised that she had been prescribed hydrocodone "Norco" painkillers after a past surgery. Cherie FERGUSON volunteered that her husband felt that she might be addicted to the hydrocodone and so kept her pill bottle in their black GMC truck. Cherie FERGUSON explained that she only took six and a half "Norco's" a day and that she did not feel like she was drug addicted. At this point, TFO Stenzel explained that Agents had recovered her pills and pill bottle pursuant to a search warrant Agents executed at ███████ Street, Chicago, Illinois. Cherie FERGUSON became extremely upset and explained that those pills were hers and that her husband would not have taken them elsewhere. At this point, S/As Labno and Burney asked Cherie FERGUSON if she would consent to a search of the black GMC truck and Agents could look for her pills. Agents explained that Cherie FERGUSON had every right to refuse to consent to this search and require Agents to seek a search warrant. Cherie FERGUSON stated that she understood this and was willing to still consent to a search. S/A Burney then provided her with ATF Form 3220.11, Consent to Search Form. S/A Burney then read this form to Cherie FERGUSON, explaining each right concerning a consent search—especially the fact that Cherie FERGUSON had every right to refuse to allow Agents to search the black GMC Denali. Cherie FERGUSON explained that she understood her rights and was willing to waive them and allow Agents to search the truck. Cherie FERGUSON then signed this form to memorialize her understanding of her rights as well as her willingness to agree to a consent search. S/As Labno and Burney then signed this form as witnesses.

17. Cherie FERGUSON then retrieved her keys and opened the truck for Agents. Agents then conducted a systematic search of the truck and recovered the following pieces of evidence: Numerous miscellaneous documents of indicia, (1) black wallet, (3) belts, $1550 in cash, (4) separate checks totaling $3550, (5) watches, and $950 in suspected counterfeit currency.

18. After the search of truck was complete, Agents secured the truck and returned the keys to Cherie FERGUSON. Agents explained that they had not found any of her pill bottles in the truck and Cherie FERGUSON stated that she knew as she had been present for the search. S/A Labno should note that TFO Stenzel and Financial Investigator Mike Priess then conducted an interview with Cherie FERGUSON which is documented in a separate Report of Investigation (ROI).

19. On November 7, 2018, S/A Koslowski returned several items of personal property to Cherie FERGUSON while she attended FERGUSON's detention hearing at federal court located at 219 S. Dearborn, Chicago, Illinois. (See attached ATF Form 3400.23)

20. This is only a summary of these events and not intended to be a verbatim account.

## ATTACHMENTS:

- ATF Form 3220.11.
- 18M684 Search Warrant return
- ATF Form 3400.23 (truck consent search)
- ATF Form 3400.23 (returned property)

ATF EF J120.2 (10-2004)
For Official Use Only

REPORTS_001-001899

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

### Consent to Search

Case Number

_772010-16-0005_

I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.

I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.

I understand that I may consult with an attorney before or during the search.

I understand that I may withdraw my consent to this search at any time prior to the search's termination.

This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.

I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct a complete search of the property described below.

Describe Vehicle, Premises, Person, or Items to be Searched.

2018 Black GMC Denali 4 door pickup
License plate 2185338 B
exp 11-18

| Signature of Consentee | Date |
| --- | --- |
| | 10-30-2018 |
| Signature of Special Agent | Date |
| | 10-30-18 |
| Signature of Witness(es) | Date |
| | 10-30-18 |

ATF Form 3220. 11
Revised March 2007

Exhibit B:
ATF Report of Investigation, prepared by
Special Agent Christopher Labno, dated
Nov. 16, 2018.

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation | | Investigation Number | Report Number: 170 |
|---|---|---|---|

## SUMMARY OF EVENT:

Custodial interview of Terry FERGUSON

## NARRATIVE:

1. **CUSTODIAL INTERVIEW:** On October 30, 2018, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Chicago Police Department (CPD) and the Illinois State Police (ISP), executed a federal arrest warrant on Terry FERGUSON (white male, DOB: ▓▓▓▓▓▓) at his residence located at ▓▓▓▓▓▓ Willowbrook, IL. FERGUSON was transported to ATF Chicago Division Office for processing and interviewing.

2. Prior to interviewing FERGUSON, S/A Burney asked FERGUSON if he could read and write, to which FERGUSON replied that he could. S/A Burney then advised FERGUSON of his constitutional rights via Miranda pursuant to ATF Form 3200.4. Specifically, at approximately 1101 hours, S/A Burney provided FERGUSON with ATF Form 3200.4, Advice of Rights and Waiver and he (FERGUSON) followed along as S/A Burney read aloud from this form explaining each right to FERGUSON. FERGUSON then explained that he understood his rights, and agreed that he was willing to waive these rights in order to speak with Agents. At approximately 1102 hours, FERGUSON then signed this form to memorialize his understanding of his rights and his willingness to waive his rights and speak with Agents. It should be noted that prior to beginning the interview, Agents offered FERGUSON a bottle of water to drink and a chance to use the restroom.

3. S/A Labno asked FERGUSON what he could specifically do with regard to pro-active cooperation. FERGUSON replied, "It's real simple, you know, it's like, you tell me what you want and if I can help you, I'll help you." Agents confirmed with FERGUSON that he was interested in cooperating and doing proactive work, FERGUSON replied, "Correct."

4. S/A Labno asked FERGUSON if he knew Mark Anthony (Mark VELASQUEZ). FERGUSON replied, "Just a guy I know through Jesse. (Jesus DOMINGUEZ)." Agents asked FERGUSON if Mark Anthony supplied cocaine. FERGUSON slightly nodded his head and stated, "Well, like I said, just tell me what you want and if I can help you, I'll help you." S/A Labno asked FERGUSON if he could buy cocaine from VELASQUEZ. FERGUSON replied, "Yea." S/A Labno then asked FERGUSON if he could introduce other people to buy

| Prepared by: Christopher J. Burney | Title: Special Agent, Chicago I Field Office | Signature: | Date: 11-16-18 |
|---|---|---|---|
| Authorized by: Bennie Mims | Title: Group Supervisor, Chicago I Field Office | Signature: A/GS Matthew Jan | Date: 11/18/18 |
| Second level reviewer (optional): Celinez Nunez | Title: Special Agent in Charge, Chicago Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001884


cocaine from VELASQUEZ. FERGUSON replied, "Yea." Agents asked how much cocaine he could buy from VELASQUEZ, FERGUSON replied, "I don't know, I just know what he does."

5. Agents asked if FERGUSON owned KM&F and M2 Properties LLC, FERGUSON replied that he did not own them, but worked for them.

6. Agents asked FERGUSON if he had talked to Jesse (DOMINGUEZ) recently, FERGUSON replied, "Yea." Agents then asked if FERGUSON knew Mark's brother, Mike VELASQUEZ. FERGUSON replied, "Yea, but again, you know you guys want me to do all this but I'm wondering what's gonna happen with me. I wanna know that first then I'll tell you whatever you want."

7. Agents asked FERGUSON what he wanted. FERGUSON replied, "Obviously I want to go home." Agents explained to FERGUSON that they needed specifics in regards to what exactly he could do for them in order to tell the US Attorney's Office (USAO). FERGUSON replied, "I can do anything that you want me to do, that's plain and simple, like I said, until I see what's in it for me, why would I do anything?" FERGUSON continued that he would work with agents 100% and could do anything agents needed.

8. Agents asked FERGUSON if he could buy guns. FERGUSON replied, "Yep, well not a ton, I wouldn't say a ton now." Agents asked if he could buy said guns from people that agents already knew. FERGUSON replied, "Outlaws." Agents asked if FERGUSON was hooked up pretty good with the Outlaws, FERGUSON replied, "We're friends." Agents asked if the Outlaws for Northside or Southside, FERGUSON replied, "Southside."

9. Agents told FERGUSON that they wanted to revisit a prior conversation (this conversation is documented in another Report of Investigation (ROI)) regarding suspicions that he was involved in criminal activity with his attorney. FERGUSON replied, "But that's not true. I'm not involved in no shady shit with him. I know that he's uh...well, like I said, you tell me what you want and we'll go from there. If I can help you, I'll help." Agents asked FERGUSON if he knew his attorney to be involved in criminal activity. FERGUSON replied, "All depends on what's...like I said, until I see something that's with me, you know, he's the man that's..." Agents again reminded FERGUSON about their conversation earlier regarding guys involved in criminal activity, FERGUSON replied, "I said that I can help you."

10. Agents again asked FERGUSON what he wanted. FERGUSON explained that he was still detained and wanted to go home. FERGUSON then suggested that he wanted to talk more in another room that wasn't being audio and video recorded. Agents told FERGUSON that they could make that happen. Agents told FERGUSON that they would need more from him in order to convince the USAO that he would be a valuable cooperator. FERGUSON stated, "There's not really much that I'm on, caught on, right now anyway, the convincing couldn't be that hard. I'm gonna do what you want. You want to talk about Beau, you want to talk about everyone, that's fine." FERGUSON continued, "And I knew you were a cop the whole time, I told you that remember." S/A Labno asked FERGUSON, "Then why were you involved in doing that?" FERGUSON responded, "Well, every time you asked me for guns or coke, what did I tell you? On camera, no I don't do that, it's cash." FERGUSON continued, "You're talking Beau, not a problem, you have to do your end now."

11. S/A Labno then told FERGUSON, "It's clear that we're not telling you to entrap anybody, we're only interested in people who are committing crimes already." FERGUSON replied, "I understand. Yea, I'm not like the federal government. I'm not going to create crime, giving Newports and Northfaces, you see?" FERGUSON continued that he was willing to cooperate with agents. FERGUSON further stated that his word

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001885



| Title of Investigation | | Investigation Number: | Report Number: |
|---|---|---|---|
| | | | 170 |

should be enough, in regards to his commitment to cooperate with agents.

12. At approximately 1121 hours, Agents told FERGUSON that they were going to call the USAO and exited the interview room.

13. At approximately 1154 hours, Agents returned. Agents explained to FERGUSON that they were at an impasse with the USAO and that the USAO wanted more. Agents continued that FERGUSON was looking at a 10 year mandatory minimum on the current charge. Agents further stated to FERGUSON that if he was serious about cooperating that he needed to tell his attorney about proffering as soon as possible. Agents then explained the proffer process.

14. At approximately 1203 hours, Agents searched FERGUSON and removed approximately $3465.00 in cash. Agents secured his personal property (shoe laces and belt) prior to transferring to the United States Marshals Service (USMS) custody.

15. At approximately 1210 hours, the custodial interview concluded, a short time later, FERGUSON was transported to the United States District Court House for his initial appearance.

ATF EF 3120.2 (10-2004)
For Official Use Only

REPORTS_001-001886

 

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Advice of Rights and Waiver

### Statement of Rights

- You have the right to remain silent.

- Anything you say can be used against you in court.

- You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.

- If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

### Waiver

I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

Signature: _____

Printed Name: _Terry Ferguson_

Witness Signature: _____

Printed Name: _Chris Burney_

Date/Time: _10-30-18 , 1158 Am_

Note: Previous Editions Are Obsolete

ATF Form 3200.4
Revised September 2005