UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EUGENE ALEXANDER, aka "SRT" | No. 17 CR 319-3<br><br>Judge John Robert Blakey |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Eugene Alexander was convicted of possessing with the intent to distribute 500 grams or more of cocaine after a week-plus long jury trial. On April 11, 2016, defendant paid $80,000 in cash for three kilograms of cocaine before leading law enforcement officers on a high-speed chase through a residential neighborhood. But that was not his first purchase. Defendant bought large quantities of narcotics from the same drug-trafficking organization ("DTO") on a regular basis since 2012.

Defendant's conduct coupled with his significant criminal history warrant a substantial sentence. The government recommends a sentence of 210 months' imprisonment, which is below the applicable Guidelines range, and is sufficient but not greater than necessary to achieve the goals of sentencing.

## I. OFFENSE CONDUCT

On or about April 11, 2016, at Melrose Park, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant did knowingly and intentionally possess with the intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

Specifically, cooperating defendant Ricardo Castaneda testified at trial that, prior to his arrest in this case, he was a narcotics trafficker who sold wholesale quantities of drugs, including heroin and cocaine, to customers in and around the Chicagoland area, including to defendant on April 11, 2016. Tr. at 525-33, 537-40.[1] Castaneda testified that, prior to the meeting on April 11, 2016, defendant messaged Castaneda and informed him that he [defendant] wanted to purchase cocaine from Castaneda. *Id.* at 540. Castaneda agreed to meet with defendant on April 11, 2016, to complete the transaction. *Id.*

Castaneda further testified that on the morning of April 11, 2016, he met with Santos Godina, a co-defendant and courier for Castaneda's drug trafficking organization. *Id.* at 541. In other words, while Castaneda was responsible for providing the drugs to defendant, Godina's role was to carry and physically deliver the drugs to defendant. *Id.* at 541, 553-54. According to Castaneda, the plan was to meet with Godina at a Dunkin Donuts before the transaction. *Id.* at 541. Once Castaneda and Godina met at the Dunkin Donuts, Castaneda drove Godina's car—a silver Honda—to one of the DTO's stash houses to retrieve three kilograms of cocaine and a new burner phone for defendant. *Id.* at 542, 549. Castaneda placed the drugs and burner phone into a red bag and placed the red bag into Godina's car. *Id.* at 543-45. Castaneda's testimony about meeting with Godina at Dunkin Donuts, leaving for a period of time, and then returning to Dunkin Donuts was corroborated by

---

[1] Citations to docket are to "Dkt.," followed by the document number. Citations to the trial transcript are to "Tr." followed by the page number. Citations to government's exhibits are to "GX" followed by the exhibit number.

surveillance footage that was shown to the jury and admitted as Government Exhibit 201. At trial, Castaneda also identified GX 102 as being the same bag he used to carry the drugs and phone to deliver to defendant. Tr. at 543-44.

After returning to the Dunkin Donuts, Castaneda and Godina drove to the agreed-upon meeting location at 23rd Avenue and Lake Street in Melrose Park. Tr. at 549-50. Castaneda testified that he parked on the west side of 23rd Avenue, just south of Lake Street. Id. at 550. Godina parked on the opposite side of the street. *Id.* at 551. While Castaneda and Godina were parked on 23rd Avenue, Castaneda observed a white Land Rover drive onto the block. *Id.* at 552. At the same time that the white Land Rover pulled onto the block, Castaneda received a text message from defendant informing Castaneda that defendant had arrived. *Id.* at 553. Castaneda then observed Godina exit his car holding a red bag—the same red bag that Castaneda placed in Godina's car—and walk toward the white Land Rover. *Id.* at 553-54. According to Castaneda, Godina walked away from the white Land Rover with a different bag, carrying $80,000 in cash, payment for the three kilograms of cocaine that Castaneda had just sold to defendant. *Id.* at 554-55.

Finally, Castaneda testified that, after the transaction was completed, he observed defendant drive south on 23rd Avenue, away from the where the transaction occurred. *Id.* at 555. According to Castaneda, another vehicle—a gray Dodge Journey—pulled and drove behind defendant as he left the scene. *Id.* at 556. Castaneda did not recognize the vehicle and sent a message to defendant asking if the gray Journey was with defendant, to which defendant responded no. *Id.*

Castaneda testified that, a short time later, defendant called and informed Castaneda that defendant was pulled over and that defendant's picture was taken. *Id.* at 556-57. In fact, defendant led law enforcement officers on a high-speed chase through a residential neighborhood before ultimately being stopped and briefly detained. *See*, Dkt. 320 at 18, n. 7 (In denying defendant's motion to suppress, the Court found as a factual matter, that defendant "committed multiple traffic violations when he drove his vehicle in a reckless manner, including at the moment when he made a left turn that cutoff the agents' car and crossed through the intersection at the outset of his high speed flight in a residential area.").

Ultimately, the jury credited the testimony of Castaneda, as well as the testimony of Godina and the law enforcement officers who stopped defendant and seized the drugs, and found defendant guilty of possessing with intent to distribute 500 grams or more of cocaine. Additionally, the evidence at trial proved Castaneda distributed three kilograms of cocaine of defendant on April 11, 2016.

In addition to distributing 3 kilograms of cocaine to defendant on April 11, 2016, Castaneda and his brother (together, the "Castaneda DTO") also sold kilogram quantities of heroin to defendant. *See* Castaneda GJ Trans. at 25-27. Although Castaneda did not specify how much heroin the Castaneda DTO sold to defendant, Castaneda testified that his brother had a drug distribution relationship with defendant dating back to 2012. *Id.* at 16-18. Defendant not only purchased wholesale quantities of drugs from the Castaneda DTO, defendant also rented a stash house to the Castaneda DTO to store drugs. *Id.* at 16. Defendant's drug dealing activities

outside of the charged conduct are relevant factors for the Court to consider pursuant to 18 U.S.C. § 3553(a).

## II. ADVISORY GUIDELINES RANGE

The government has reviewed the criminal history and offense level calculations set forth in the Presentence Investigation Report ("PSR") submitted by the United States Probation Office. The government agrees with Probation that defendant qualifies as a Career Offender, with a total offense level of 34 and a criminal history category of VI, resulting in an advisory Guidelines imprisonment range of 262 to 327 months' imprisonment. Defendant is also subject to a 5-year mandatory minimum sentence.

## III. THE FACTORS SET FORTH IN SECTION 3553 WARRANT A SENTENCE OF 210 MONTHS' IMPRISONMENT

Criminal sentencing has four purposes – retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the particular sentence to impose, the Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. *See* § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 522

U.S. 38, 128 S. Ct. 586, 596 (2007). For two reasons, this Court should give serious consideration to the advisory Guidelines range.

*First*, the Sentencing Guidelines are the sole factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, § 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *id.* at 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the "basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious weight to the Guidelines.

*Second*, the Guidelines deserve meaningful consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 128 S. Ct. at 594. It is true that there is no "presumption" that a Guidelines sentence is the "correct"

sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology; its judgments should not lightly be disregarded." *United States v. Wachowiak*, 496 F.3d 744, 753 (7th Cir. 2007) (internal quotation and citation omitted). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system. *See* 28 U.S.C. § 994(o). These ongoing efforts to refine the Guidelines are another reason seriously to consider the advisory range.

Here, a careful consideration of the § 3553(a) factors—especially defendant's conduct and criminal history—weigh in favor of a 210-month sentence.

**A. Nature and Circumstances of the Offense**

The nature and circumstances of defendant's offense conduct are incredibly serious. The Court is well aware of the dangers of narcotics on individual users, their families and their communities. In short, drug use and addiction are causing the deterioration of whole neighborhoods in Chicago, and the narcotics distribution business brings consequences beyond the narcotics themselves, including the increase in violence and homicides in many of the district's communities.

Here, defendant purchased an immense amount of cocaine, a highly potent opioid. As noted at trial, this cocaine was not for personal consumption; it was for distribution. And defendant had purchased similar quantities in the past, also for

distribution. Defendant's relationship with the DTO dated back to 2012. He was not a one-time customer; he was a regular wholesale customer who bought narcotics and then sold them to street-level customers. He also rented a stash house to the DTO so it could store its drugs. Defendant's drug dealing activities were serious and extensive.

But defendant's dangerous actions were not limited to buying and selling cocaine. As discussed at trial, after purchasing three kilograms of cocaine on April 11, 2016, defendant led law enforcement on a high-speed chase through a residential neighborhood. Contrary to the assertions stated in defendant's sentencing memorandum, the testimony regarding the chase and the dangers it posed was uncontroverted. Defendant's flight through a residential neighborhood put both ordinary citizens and law enforcement at risk. His high rate of speed and multiple traffic violations created a substantial risk of death or serious bodily injury.

**B. History and Characteristics of Defendant**

Section 3553(a)(1) directs that in determining an appropriate sentence, the Court shall consider not only the nature and circumstances of the offense, but the history and characteristics of the defendant. The government acknowledges that defendant's convictions are old, but that does not make them any less serious. Defendant has an attempted murder conviction from 1994 and a possession of controlled substance conviction from 1995. PSR ¶¶ 33, 32. The attempted murder conviction involved defendant and his co-defendants firing fifteen rounds at a car with an 18-month-old child inside. PSR ¶ 33. He was sentenced to thirty years'

imprisonment for the attempted murder conviction, and nine years' imprisonment for the possession conviction. PSR ¶¶ 33, 32. He has a third conviction for a traffic offense in 2012, as well as a litany of arrests. PSR ¶¶ 34, 39-50. Defendant's criminal history qualifies him as a career offender, which automatically results in an offense level of 34 and a criminal history category of VI. PSR ¶¶ 21, 22, 35. The government acknowledges that this classification results in a very high Guideline range, and for good reason.

The government further acknowledges, as detailed in the PSR and in defendant's sentencing memorandum, that defendant comes from a supportive family and has made significant strides toward turning his life around. PSR ¶¶ 54, 58, 65-68. Because of the age of defendant's prior convictions as well as the mitigating factors outlined in the PSR, the government recommends a below-Guideline sentence. The government stresses, however, that a sentence of 210 months is more than appropriate given the conduct here, the testimony and evidence at trial, the nature of defendant's prior convictions, and defendant's failure to follow the law.

### C. Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

Finally, a sentence of 210 months' imprisonment is sufficient, but not more than necessary, to promote respect for the law, to afford adequate specific deterrence of this defendant, and to provide a just punishment. As discussed above, defendant's conduct involved possessing with the intent to distribute a highly addictive substance, and a serious sentence is necessary to provide a just punishment for this serious conduct. Further, contrary to the arguments stated in defendant's sentencing

memorandum, a sentence of 210 months does not create sentencing disparities and is entirely appropriate given the timing of co-defendants' acceptance of responsibility, their cooperation, and their less serious criminal histories.

## IV. SUPERVISED RELEASE

The government has reviewed the conditions of supervised release set forth in the Presentence Investigation Report submitted by the United States Probation Office and has no objection to the proposed conditions. The government defers to Probation as to whether defendant violated the terms of his pre-trial release and whether defendant is still required to register under the Illinois Murderer and Violent Offender Against Youth Registration Act.

## V. CONCLUSION

For the foregoing reasons and consistent with the goals of Title 18, United States Code, Section 3553, the government respectfully requests that the Court sentence defendant to a below-Guidelines sentence of 210 months' imprisonment, along with four years of supervised release, subject to the conditions set forth herein.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/ Megan E. Donohue*
MEGAN E. DONOHUE
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-1877